**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MONARCH CONTENT MANAGEMENT LLC, a Delaware limited liability company; LAUREL RACING ASSOCIATION, INC., DBA Laurel Park, a Maryland corporation, *Plaintiffs-Appellants*, | No. 20-15047<br><br>D.C. No.<br>2:19-cv-04928-JJT |
| v. | OPINION |
| ARIZONA DEPARTMENT OF GAMING, a political subdivision; TED VOGT, Director, in his official capacity; RUDY CASILLAS, Deputy Director and Racing Division Director, in his official capacity; ARIZONA RACING COMMISSION, a subordinate political entity; RORY S. GOREE, Chairman, in his official capacity; TOM LAWLESS, Vice Chairman, in his official capacity; J.C. MCCLINTOCK, Commissioner, in his official capacity; CHUCK COOLIDGE, Commissioner, in his official capacity, *Defendants-Appellees.* | |

Appeal from the United States District Court
for the District of Arizona
John Joseph Tuchi, District Judge, Presiding

Argued and Submitted July 17, 2020
San Francisco, California

Filed August 20, 2020

Before:  A. Wallace Tashima and Andrew D. Hurwitz,
Circuit Judges, and Consuelo B. Marshall,[*] District Judge.

Opinion by Judge Hurwitz

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's denial of a preliminary injunction in an action challenging Arizona Revised Statute § 5-112(U), which requires, among other things, that any simulcast of live horseracing into Arizona that originates outside the state "must be offered to each commercial live-racing permittee … and additional wagering facility" in the state.

The panel held that plaintiffs, Monarch Content Management, a simulcast purchaser and sales agent for racetracks, and Laurel Park Racing Association, a Maryland racetrack whose races Monarch simulcasts, had not shown a likelihood of success on the merits of their claims.

---

[*] The Honorable Consuelo B. Marshall, United States District Judge for the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel first held that that the Interstate Horse Racing Act of 1978, 15 U.S.C. §§ 3001-3007 ("IHA"), pertaining to interstate horserace wagering at off-track sites, did not preempt § 5-112(U).  The panel determined that on their faces, the IHA and the Arizona statute regulated different actors and activities.  The IHA did not address how the states can regulate simulcasts, and the Arizona statute did not address Laurel Park's statutory right to consent before interstate wagering on its races could be conducted.  Thus, it was not facially impossible to comply with both laws.  The panel further rejected plaintiffs' argument that A.R.S. § 5-112(U), frustrates the intent of the IHA.

The panel rejected plaintiffs' argument that A.R.S. § 5-112(U) is an unconstitutional regulation on commercial speech and a forbidden content-based restriction.  The panel assumed arguendo that Monarch's simulcasts were expressive in certain respects.  The panel held, however, that the Arizona statute did not regulate that expressive content, but rather only Monarch's conduct—the "offer" to sell simulcasts to live-racing permittees and off-track betting sites.  The statute's requirement that Monarch must make simulcasts available on equal terms was plainly incidental to the statute's focus on Monarch's non-First Amendment business practices.

The panel rejected plaintiffs' Fourteenth Amendment Due Process challenge.  The panel held that because A.R.S. § 5-112(U) did not regulate speech, a less strict vagueness test applied.  The panel noted that under the statute, Monarch's wish to offer its simulcasts to some live-racing permittees and off-track betting sites in Arizona, but not to others was plainly proscribed.  The panel further found A.R.S. § 5-112(U)'s language prohibiting "any

anticompetitive or deceptive practice" to be constitutionally sufficient.

The panel held that the statute did not violate the Dormant Commerce Clause. The panel stated that Arizona treats out-of-state simulcast providers exactly the same as in-state providers. The statute does not regulate extraterritorially; it merely sets the terms of doing business if Monarch chooses to provide simulcasts in the state.

Finally, the panel held that the statute did not give rise to a Contract Clause claim. The panel concluded that nothing on the face of the Arizona statute affects whatever rights Monarch may have to terminate its contract with Turf Paradise, a live-racing permittee in Arizona; the statute regulates only the offering of simulcasts, not termination of contracts.

## COUNSEL

Scot L. Claus (argued), Vail C. Cloar, and Holly M. Zoe, Phoenix, Arizona, for Plaintiffs-Appellants.

Patrick Irvine (argued) and Charles Markle, Fennemore Craig P.C., Phoenix, Arizona; Mark Brnovich, Attorney General; Kelly M. Wagner, Assistant Attorney General; Office of the Attorney General, Phoenix, Arizona; for Defendants-Appellees.

**OPINION**

HURWITZ, Circuit Judge:

The central issue in this case is whether the Interstate Horse Racing Act of 1978, 15 U.S.C. §§ 3001–3007 ("IHA"), preempts Arizona Revised Statutes ("A.R.S.") § 5-112(U), a statute governing "simulcasts" of horse races.  We conclude that it does not, and that the plaintiffs' other facial constitutional attacks on the Arizona law also fail.  We therefore affirm the district court's denial of the plaintiffs' motion for a preliminary injunction.

**I.**

**A.  The Arizona Statutory Scheme**

Arizona law generally prohibits gambling, with several exceptions.  *See* A.R.S. §§ 5-112, 13-3305(A), 13-3301(6). "Pari-mutuel wagering," a system that distributes among successful bettors "the total amount wagered less the amount withheld under state law," is the only legal form of gambling on horseracing.  *See id.* § 5-101(23).  That wagering can occur only at the live-racing track of a permittee, or at licensed off-track betting sites ("OTBs"), *id.* § 5-112(A), (H), sometimes referred to as "additional wagering facilities" or "teletracks," *see id.* § 5-101(1); Ariz. Admin. Code § R19-2-401(12).[1]  OTB wagering typically involves a "simulcast," defined in Arizona law in pertinent part as "the telecast shown within this state of live audio and visual signals of horse [races] conducted at an out-of-state track or

---

[1] A bettor can wager "within Arizona on a racing program conducted at an authorized track within Arizona regardless of whether the racing program is telecast to the teletrack location."  Ariz. Admin. Code § R19-2-401(14) (defining "teletrack wagering").

the telecast shown outside this state of live audio and visual signals of horse [races] originating within this state for the purpose of pari-mutuel wagering." A.R.S. § 5-101(26). But, no provision of Arizona law expressly conditions OTB wagering on the use of a simulcast. Simulcasts are regulated by the Arizona Department of Gaming and the Arizona Racing Commission. *See id.* §§ 5-107, 5-108; *Ariz. Downs v. Ariz. Horsemen's Found.*, 637 P.2d 1053, 1056-57, 1060 (Ariz. 1981); *see also* Ariz. Admin. Code § R19-2-419.

The Arizona statute at issue in this case requires that "[a]ny simulcast of live racing into this state that originates from outside" Arizona "must be offered to each commercial live-racing permittee . . . and additional wagering facility" in the state. A.R.S. § 5-112(U). The statute also prohibits a "provider of simulcasts originating from outside" Arizona from engaging in "any anticompetitive or deceptive practice." *Id.* The same requirements and proscriptions apply to providers of simulcasts originating from the racetracks of Arizona live-racing permittees.[2]   *Id.* § 5-112(T).

## B.  The Interstate Horse Racing Act

In the IHA, Congress stressed that "the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). However, "in the limited area of interstate off-track wagering on horseraces," Congress found "a need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal

---

[2] Other states have similar laws. *See* Mich. Comp. Laws § 431.318; Idaho Code § 54-2512(12)(a)–(c); Ohio Rev. Code Ann. § 3769.089(B)(1)(a), (D); Fla. Stat. § 550.6305(9)(g)(1).

interstate wagers." *Id.* § 3001(a)(3); *see id.* § 3001(b) (stating legislative policy "to regulate interstate commerce with respect to wagering on horseracing, in order to further the horseracing and legal off-track betting industries"). To that end, the IHA provides that an "interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from" four parties: the host racing association, the relevant horsemen's group in the host state, the host racing commission, and the racing commission in the state where the off-track wager is placed.[3] *Id.* § 3004(a)(1)–(3). Interstate off-track wagering is otherwise prohibited by federal law. *Id.* § 3003.

## C.  Facts

Monarch Content Management is a simulcast purchaser and sales agent for racetracks. Monarch has a "Simulcast Wagering Contract" with TP Racing ("Turf Paradise"), one of three live-racing permittees in Arizona. Monarch provides simulcasts to Turf Paradise's live-racing track and OTBs, access to the betting pools of out-of-state racetracks for the races broadcast, and betting information. Monarch's simulcasts include jockey, horse, and trainer information, interviews, analysis, and graphics; Monarch facilitates this content and controls how races are bundled for distribution.

---

[3] An "off-track betting office" is "any location within an off-track State at which off-track wagers are accepted," and an "off-track betting system" is "any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run, which business is conducted by the State or licensed or otherwise permitted by State law." 15 U.S.C. § 3002(7), (8); *see also id.* § 3002(9) (defining "host racing association"), (10) ("host racing commission"), (11) ("off-track racing commission"), (12) ("horsemen's group").

Laurel Park Racing Association is a Maryland racetrack, whose races Monarch simulcasts.

Arizona Downs also runs a live-racing track and OTBs. In 2018, Monarch agreed to provide simulcasts at Arizona Downs' live racetrack, but declined to provide simulcasts to Arizona Downs' OTBs. Laurel Park followed suit and refused to allow Arizona Downs' OTBs to simulcast its races, or to accept pari-mutuel wagers from Arizona Downs' OTBs. Monarch and Laurel Park claim that "the location and character" of Arizona Downs' OTBs would dilute "the Monarch wagering product" and compromise their business interests.[4]

After A.R.S. § 5-112(U) was enacted in 2019, Monarch and Laurel Park sued the Arizona Department of Gaming, the Arizona Racing Commission, and various state officials, alleging that the statute is preempted by the IHA and facially violates the First and Fourteenth Amendments, the dormant Commerce Clause, and the Contracts Clause.[5] The plaintiffs sought a temporary restraining order against the statute's enforcement; the district court converted that application into a motion for a preliminary injunction and denied it, finding that the plaintiffs were unlikely to succeed on the merits.

---

[4] Like other racetracks, Arizona Downs relies heavily on its OTBs to generate revenue. Monarch's refusal to provide its content deprives Arizona Downs' OTBs of about 42% of the Arizona market for interstate horseracing simulcasts.

[5] Plaintiffs also alleged that A.R.S. § 5-112(U) violates the Arizona Constitution, but do not challenge the district court's rejection of that claim in this appeal.

## II.

We have jurisdiction over this appeal of the district court's denial of a preliminary injunction under 28 U.S.C. § 1292 and review for abuse of discretion. *Cuviello v. City of Vallejo*, 944 F.3d 816, 825–26 (9th Cir. 2019). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III.

### A.  Preemption

There is no express preemption provision in the IHA. *See* 15 U.S.C. §§ 3001–3007. But, under the Supremacy Clause, U.S. Const. art. VI, cl. 2., even if a federal law lacks an express provision for preemption, state law is preempted "to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (cleaned up). The plaintiffs assert that the Arizona statute is preempted because it conflicts with the IHA. "Conflict preemption" is present either "where it is impossible for a private party to comply with both state and federal law," or "where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 372–73 (cleaned up); *see also Nation v. City of Glendale*, 804 F.3d 1292, 1297 (9th Cir. 2015) ("Conflict preemption consists of impossibility and obstacle preemption."). We must be "cautious" when "a federal statute is urged to conflict with state law regulations within the traditional scope of the state's police powers," and

therefore "start with the assumption that a state's historic police powers will not be superseded absent a 'clear and manifest purpose of Congress.'" *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).

### 1.

On their faces, the IHA and the Arizona statute regulate different actors and activities. Under federal law, before an Arizona "off-track betting system" can accept an "interstate off-track wager" on Laurel Park's races, Laurel Park must consent as the "host racing association," and the Arizona Racing Commission must consent as the "off-track racing commission." 15 U.S.C. §§ 3002(9), 3004(a)(1), (3). Under state law, if Monarch wishes to simulcast (provide a live feed of racing to a live-racing permittee or OTB for purposes of pari-mutuel wagering) in Arizona, it must offer its signals to all live-racing permittees and OTBs in the state. A.R.S. § 5-112(U). The IHA does not address how the states can regulate simulcasts, and the Arizona statute does not address Laurel Park's statutory right to consent before interstate wagering on its races can be conducted. Thus, it is not facially "impossible" to comply with both laws. *See Crosby*, 530 U.S. at 372–73.

The plaintiffs cite their agreement to make common business decisions and assert that A.R.S. § 5-112(U) requires Monarch to provide access to wagering on Laurel Park's races without Laurel Park's consent. It does not. The Arizona statute simply requires Monarch to offer "[a]ny simulcast of live racing" to each live-racing permittee and OTB in the state if it offers that simulcast to anyone in Arizona—it says nothing about providing access to the pari-mutuel betting pools for Laurel Park's races. *See* A.R.S. § 5-112(U). Although simulcasts are offered "for the purpose of

pari-mutuel wagering," *id.* § 5-101(26), only Laurel Park can consent to wagering on its races, not Monarch, *see* 15 U.S.C. § 3004(a)(1)–(3). Nothing makes it facially "impossible" for the plaintiffs to comply with both statutes. *See Crosby*, 530 U.S. at 372–73; *see also Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 479 F.3d 1310, 1312 n.3 (11th Cir. 2007) (per curiam) (agreeing with Florida Supreme Court that the IHA does not preempt the state's requirement that permitholders accepting wagers on simulcasts make those simulcasts available to other eligible permitholders (citing *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 948 So. 2d 599, 607–08 (Fla. 2006))).

## 2.

The plaintiffs also argue that A.R.S. § 5-112(U) frustrates the intent of the IHA because the federal act contemplates that the host racing association can consent to wagering on "an off-track betting system" basis, 15 U.S.C. § 3004(a), while the State asserts that it will withhold consent for wagering on all Laurel Park races that are simulcast into Arizona if those signals are not offered equally to all Arizona live-racing permittees and OTBs.

"We discern congressional objectives by 'examining the federal statute as a whole and identifying its purpose and intended effects.'" *Chae*, 593 F.3d at 943 (quoting *Crosby*, 530 U.S. at 373). Put differently, we "consider carefully what Congress was trying to accomplish." *Id.* at 944; *see Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("[A] high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." (cleaned up)). We start from the premise that the IHA pointedly left intact the states' "primary responsibility for determining what forms of gambling may legally take place

within their borders," thus preserving their traditional police powers. 15 U.S.C. § 3001(a)(1); *see Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that "the regulation of gambling lies at the heart of the state's police power" (cleaned up)). However, for the "limited" purpose of ensuring the states' cooperation in the acceptance of interstate wagers, Congress allowed interstate off-track horserace wagering only upon the obtaining of the four statutory consents. 15 U.S.C. §§ 3001(a)(3), (b), 3004(a)(1)–(3).

In arguing that the Arizona statute conflicts with the intent of the IHA, Monarch and Laurel Park rely on *Horseman's Benevolent & Protective Association v. DeWine*, 666 F.3d 997 (6th Cir. 2012). That case involved an Ohio statute providing that the host horsemen's organization could not "unreasonably" withhold its consent to interstate wagers; if the consent were withheld "without substantial merit," the Ohio racing commission could authorize wagering on out-of-state races with only the consent of the host racing association. *Id.* at 1000 (citing Ohio Rev. Code Ann. § 3769.089(G)). The Sixth Circuit noted that the "horsemen's veto is an integral part of the Act," which the Ohio statute would "negate." *Id.* at 1000–01. Because the Ohio law allowed the "host racing association to consent to interstate off-track betting in the absence of a written agreement with the horsemen's group," it directly conflicted with the IHA. *Id.* at 1000.

The Sixth Circuit case provides no succor to the plaintiffs here. As that court recognized, the IHA grants the host racing association, the host horsemen's group, the host racing commission, and the off-track racing commission each an absolute veto over interstate off-track wagering. *Id.* at 1000–01; *see* 15 U.S.C. § 3004(a)(1)–(3). Although "[a]n

interstate off-track wager may be accepted by an off-track betting system" with the consent of those four parties, 15 U.S.C. § 3004(a)(1)–(3), none is ever required to consent. Even if, as the State contends, the Arizona Racing Commission will choose to withhold its consent to interstate wagering unless simulcasts of the affected races are made equally available to all live-racing permittees and OTBs, the IHA contains no "clear and manifest purpose" to limit the Commission's veto.**[6]** *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up); *see also Chae*, 593 F.3d at 944; 15 U.S.C. § 3001(a)(1), (3). Regardless of the Arizona statute, Laurel Park retains all rights granted by the IHA because no wagers can be placed on its races in Arizona over its objection.**[7]** *See Horseman's Benevolent & Protective Ass'n*, 666 F.3d at 1000–01.

## B. First Amendment

The plaintiffs argue that A.R.S. § 5-112(U) is an unconstitutional regulation on commercial speech and a forbidden content-based restriction. The arguments fail.

Our inquiry begins, and ultimately ends, with whether A.R.S. § 5-112(U) regulates speech. *See Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150 (2017); *see*

---

**[6]** We note that such a construction of the Arizona statute is not required by the plain text, and no Commission decision is before us. *See Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104, 1107–08 (9th Cir. 2016).

**[7]** The plaintiffs argue for the first time on appeal that A.R.S. § 5-112(U) conflicts with the requirement that "any off-track betting office shall obtain the approval of[] all currently operating tracks within 60 miles," 15 U.S.C. § 3004(b)(1)(A). We decline to address this issue in the first instance. *See Davis v. Nordstrom*, 755 F.3d 1089, 1094–95 (9th Cir. 2014).

*also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018). If a "law's effect on speech [is] only incidental to its primary effect on conduct," there is no "abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design*, 137 S. Ct. at 1151 (second quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006)); *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (cleaned up)).

We assume arguendo that Monarch's simulcasts are expressive in certain respects. However, the Arizona statute does not regulate that expressive content, but rather only Monarch's conduct—the "offer" to sell simulcasts to live-racing permittees and OTBs. A.R.S. § 5-112(U). The statute's requirement that Monarch must make simulcasts available on equal terms is plainly incidental to the statute's focus on Monarch's non-First Amendment business practices. *See Expressions Hair Design*, 137 S. Ct. at 1150–51. As the Supreme Court has explained, "a law requiring all New York delis to charge $10 for their sandwiches" is a regulation of conduct, even though "in order to actually collect that money" a seller will have to conform its speech to communicate the price. *Id.* Here, although Monarch must offer simulcasts to new customers to comply with A.R.S. § 5-112(U), the statute does not affect any expression in those simulcasts. *Id.* at 1151.

Rather, the statute is unconcerned with the content of Monarch's simulcasts, and does not differentiate based on the identity of a provider. Although Monarch is required to

offer its product more broadly than it wishes, the statute does not regulate what Monarch says, only to whom Monarch must offer its simulcasts when doing business in Arizona. As the plaintiffs acknowledge, the plain purpose of A.R.S. § 5-112(U) is to increase the number of simulcasts, not restrict them. And, because a simulcast is the telecast of a race "for the purpose of pari-mutuel wagering," the statute does not apply when Monarch offers the same content in Arizona for any other purpose.**[8]** A.R.S. §§ 5-101(26), 5-112(U).

## C. Fourteenth Amendment

If a law "implicates no constitutionally protected conduct," a facial vagueness challenge under the Due Process Clause of the Fourteenth Amendment can succeed only if the law "is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010). "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test." *Vill. of Hoffman*, 455 U.S. at 498; *see*

---

**[8]** Although the plaintiffs raised a compelled speech argument below, they did not develop that argument on appeal, so we decline to consider it. *See Ventress v. Japan Airlines*, 747 F.3d 716, 723 n.8 (9th Cir. 2014). Nor have they argued on appeal that the commercial act of offering simulcasts is expressive conduct, or that the Arizona law fails the "rational basis review that courts apply to non-speech regulations of commerce and non-expressive conduct." *Retail Dig. Network, LLC v. Prieto*, 861 F.3d 839, 847 (9th Cir. 2017) (en banc); *see United States v. Swisher*, 811 F.3d 299, 310–13 (9th Cir. 2016) (en banc).

*also IDK, Inc. v. Clark County*, 836 F.2d 1185, 1198 (9th Cir. 1988) ("The absence of a significant first amendment interest is, however, fatal to a facial challenge of a business regulation for vagueness unless the regulation is vague in all possible applications.").

Because A.R.S. § 5-112(U) does not regulate speech, we apply "a less strict vagueness test" and easily conclude that the statute is not facially invalid.[9] *Vill. of Hoffman*, 455 U.S. at 494–95, 498. Monarch seeks to offer its simulcasts to some live-racing permittees and OTBs in Arizona, but not to others—and that conduct is plainly proscribed. *See id.*; *see also Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019) ("[A]s a general matter, a defendant who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a facial vagueness challenge to the statute."); *Castro v. Terhune*, 712 F.3d 1304, 1311 (9th Cir. 2013) (same).

The statute also defines "an anticompetitive or deceptive practice" as including "charg[ing] excessive or unreasonable fees," and lists relevant factors. A.R.S. § 5-112(U)(1). We routinely find similar language constitutionally sufficient. *See, e.g.*, *Wash. Mercantile Ass'n v. Williams*, 733 F.2d 687, 692 (9th Cir. 1984). Even when considering an as-applied challenge, the Supreme Court has upheld a statute that criminalized selling "goods at 'unreasonably low prices for the purpose of destroying competition or eliminating a competitor,'" citing "the additional element of predatory intent alleged in the indictment and required by the Act [as] further definition of the prohibited conduct." *United States*

---

[9] Contrary to the plaintiffs' assertions, the criminal penalties in A.R.S. § 5-112(K) apply only to a violation of the article "with respect to any wagering or betting," and would not apply if Monarch's provision of simulcasts violated § 5-112(U).

*v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 29, 32–33, 35, 37 (1963) (quoting 15 U.S.C. § 13a).  The Arizona law similarly directs the Commission to determine whether an agreement has "the purpose of securing an excessive or unreasonable fee," or "purpose or effect of artificially inflating prices beyond reasonable market rates."  A.R.S. § 5-112(U)(2), (3).  Because at least some sufficiently definite applications are plainly possible, we need not consider the plaintiffs' hypotheticals about future enforcement.  *See Nat'l Dairy*, 372 U.S. at 32; *Humanitarian L. Project*, 561 U.S. at 21.

## D.  Dormant Commerce Clause

The Commerce Clause, U.S. Const. art. I, § 8, cl. 3, has "a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."  *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994).  This so-called "dormant" Commerce Clause prohibits the states from imposing "a substantial burden on interstate commerce."  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (emphasis omitted).  However, "the commerce power of Congress is not dormant" when it authorizes state action, and "state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."  *Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 472 U.S. 159, 174 (1985).  "The primary purpose of the dormant Commerce Clause is to prohibit statutes that discriminate against interstate commerce by providing benefits to in-state economic interests while burdening out-of-state competitors."  *Ass'n des Eleveurs de Canards v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (cleaned up).  Thus, when "a statute 'regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will

be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1271 (9th Cir. 2011) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Although the IHA does not expressly authorize states to regulate simulcasts originating from out-of-state racetracks, *see Ne. Bancorp, Inc.*, 472 U.S. at 174, it plainly preserves the states' "primary responsibility" for legislating gambling within their borders, 15 U.S.C. § 3001(a)(1). We therefore discern no infringement of Congress' commerce power here. Arizona treats out-of-state simulcast providers exactly the same as in-state providers. A.R.S. § 5-112(T), (U). And, the statute does not regulate extraterritorially; it merely sets the terms of doing business if Monarch chooses to provide simulcasts in the state. Because the plaintiffs provide no support for their claims that the statute otherwise poses an overwhelming burden on interstate commerce, *see Nat'l Ass'n of Optometrists*, 682 F.3d at 1150, 1155, we need not inquire into the relative benefits and burdens of the Arizona law, *see Ass'n des Eleveurs*, 729 F.3d at 951–52.

## E. Contracts Clause

Because "not all state regulation of contracts gives rise to a Contracts Clause claim," the threshold question is whether the law substantially impairs a contractual relationship. *LL Liquor, Inc. v. Montana*, 912 F.3d 533, 537 (9th Cir. 2018); *see* U.S. Const. art. I, § 10, cl. 1. Monarch claims that the Arizona law impairs its right to terminate its contract with Turf Paradise while continuing to offer services to other customers in Arizona. Monarch's argument is puzzling; nothing on the face of the Arizona statute affects whatever rights Monarch may have to terminate its contract with Turf Paradise. The statute regulates only the

"offer[ing]" of simulcasts, not termination of contracts. A.R.S. § 5-112(U). Monarch's contractual rights are not impaired simply because its contract with Turf Paradise now subjects Monarch to new regulation in other respects. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978); *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1148–50 (9th Cir. 2004).

## IV.

Because the plaintiffs have not shown a likelihood of success on the merits, the district court did not abuse its discretion in denying a preliminary injunction.[10]

**AFFIRMED.**

---

[10] We therefore need not address the remaining *Winter* factors. *See Winter*, 555 U.S. at 20; *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1223 (9th Cir. 2017). Monarch requests judicial notice of Commission meeting minutes and a letter denying an administrative appeal. Because these documents are irrelevant to Monarch's facial challenge, we deny the motion.