RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0340p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CHURCHILL DOWNS TECHNOLOGY INITIATIVES
COMPANY,

        *Plaintiff-Appellee*,

    *v.*

MICHIGAN GAMING CONTROL BOARD,

        *Defendant*,

HENRY L. WILLIAMS, JR., in his official capacity as
Executive Director of the Michigan Gaming Control
Board; DANA NESSEL, in her official capacity as
Attorney General of the State of Michigan,

        *Defendants-Appellants*.

> No. 25-1235

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:25-cv-00047—Hala Y. Jarbou, Chief District Judge.

Argued: October 23, 2025

Decided and Filed: December 16, 2025

Before: NALBANDIAN, MATHIS, and RITZ, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Mark G. Sands, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Thomas H. Dupree, Jr., GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellee. **ON BRIEF:** James P. Kennedy, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Thomas H. Dupree, Jr., John W. Tienken, Abby H. Walters, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Christine Demana, GIBSON, DUNN & CRUTCHER LLP, Dallas, Texas, Patrick G. Seyferth, Derek J. Linkous, BUSH SEYFERTH PLLC, Troy, Michigan, for Appellee. James M.

Stipe, BURCH & CRACCHIOLO, P.A., Phoenix, Arizona, Andrea L. Hansen, HONIGMAN LLP, Lansing, Michigan, Jeffery V. Stuckey, DICKINSON WRIGHT PLLC, Lansing, Michigan, Phillip J. DeRosier, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Amici Curiae.

_____

**OPINION**

_____

NALBANDIAN, Circuit Judge.   TwinSpires, an Oregon-based electronic wagering platform and a business unit of Churchill Downs Inc., accepts interstate wagers on horseraces. This is legal under the Interstate Horseracing Act (IHA) if TwinSpires obtains consent from state regulators and the racetrack's racing association.  But *which* state regulators?  TwinSpires says only Oregon and the racetrack's home state.  Michigan says it too can regulate wagers that are made in Michigan but accepted on the TwinSpires application.  So when TwinSpires fell out of compliance with Michigan's regulations, Michigan revoked TwinSpires' license under the Michigan Horse Racing Law (MHRL).

TwinSpires sued, arguing that Michigan's enforcement of the MHRL is inconsistent with the IHA.  The district court agreed and issued a preliminary injunction.  And we agree with the district court.   TwinSpires is likely to show that the IHA preempts Michigan's licensing requirement, and the other preliminary injunction factors favor TwinSpires.  So we affirm.

**I.**

Many Americans—especially residents of this Circuit—bet on horseraces.  When they do, they generally wager in "pari-mutuel"[1] pools.  Pari-mutuel wagering refers to "any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool . . . and in which the participants are wagering with *each other* and not against the operator."  15 U.S.C. § 3002(13) (emphasis added).  In this system, organizers aren't interested in the outcome of any particular bet.  But organizers—such as racetracks—aren't altruists.  They

---

[1]"Pari-mutuel" is French for "mutual wager."

retain a percentage of the betting pool as the "takeout," so they earn more when they attract more bettors. Winning bettors then collect from the rest of the pool.

States, of course, have traditionally regulated intrastate gambling activity like wagering on horseracing. And Michigan is no exception, having long regulated wagering on horseraces—to varying degrees. For example, the state banned the practice in 1819. An Act to Prevent Horse Racing, Laws of the Territory of Michigan (Detroit: Sheldon & Reed, 1820), § 1 (Oct. 12, 1819). But it loosened the reins in 1933 when it legalized pari-mutuel horserace wagering, though with strict guardrails. House Fiscal Agency, *Fiscal Focus: Horse Racing in Michigan— A Primer*, at 2 (June 2017).

For much of our country's horseracing history, state regulatory regimes like Michigan's worked just fine. Pari-mutuel wagering on horseraces was an *intrastate* activity. Bettors placed their bets at the racetrack and amassed (or squandered) their fortunes from the stands.

But by the 1970s, horserace wagering had become a national enterprise. Betting extended across state lines. Technological advancements made it so that bettors could bet on races in state C from state A or even send bets from state A to state B for a horserace in state C. State regulators, racetracks, and other horseracing industry players quarreled over how to handle these interstate wagers. *See Ky. Div., Horsemen's Benevolent & Protective Ass'n v. Turfway Park Racing Ass'n*, 20 F.3d 1406, 1414 (6th Cir. 1994). And states adopted different approaches, sanctioning wagering practices that others forbade. With several states potentially involved in a single wager, the question of which state's approach mattered most became unavoidable.

So Congress stepped in to replace this patchwork with a uniform federal scheme. In 1978, it enacted the IHA. Congress found a "need for Federal action to ensure States will continue to cooperate with one another in the acceptance of legal interstate wagers," but disclaimed "primary responsibility for determining what forms of gambling may legally take place *within* [State] borders." 15 U.S.C. § 3001(a)(1), (3) (emphasis added). The IHA prohibits "accept[ing] an interstate off-track wager except as provided in" its framework. *Id.* § 3003. An "interstate off-track wager" is "a legal wager placed or accepted in one State with respect to the

outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved . . . as well as the combination of any pari-mutuel wagering pools." *Id.* § 3002(3).

And under the IHA's framework, an "off-track betting system," or "any group which is in the business of accepting wagers on horseraces at locations other than . . . where the horserace is run," may accept interstate wagers, provided they obtain consents from three entities. *Id.* §§ 3002(7), 3004(a).   These entities are the host racing association[2] (which conducts the horserace), the host racing commission (the regulator in the horseracing state), and the off-track racing commission (the regulator in the state where the wager is accepted).  *Id.* §§ 3002(6), (9)–(11), 3004(a).

## II.

Of course, after the IHA's enactment, the states continued to regulate horseracing, at least within their own borders.  And Michigan is no different.  This case explores whether and to what extent a state can regulate out-of-state companies like TwinSpires, which accept bets on out-of-state horseraces that are placed by persons within the state's borders.

In 1995, Michigan enacted the MHRL, which set up a licensing regime for horseracing, simulcasting (simultaneous broadcasting), and wagering.  *See* 1995 Mich. Pub. Acts 279. Essentially, the simulcasts were of out-of-state races that Michiganders could watch in Michigan and wager on from the simulcast sites in Michigan.

In 2010, TwinSpires began accepting online wagers from Michiganders.  But it didn't secure Michigan's blessing under the state's then-operative regulatory regime.  So in 2013, the Executive Director of the Board instructed the company to stop accepting online pari-mutuel wagers from Michiganders.  Yet Michigan didn't take further action.

---

[2]The host racing association must also "have a written agreement with the horsemen's group, under which said racing association may give such consent."  15 U.S.C. § 3004(a)(1)(A).  A "horsemen's group" means "the group which represents the majority of owners and trainers" at a given association.  *Id.* § 3002(12).

In 2019, Michigan amended the MHRL to cover electronic betting platforms. As amended, the law requires that organizers of pari-mutuel wagering—racetracks—obtain a race-meeting license. Once they've done that, race-meeting licensees may accept wagers "electronically through a licensed third-party facilitator." Mich. Comp. Laws § 431.317(8). So under the MHRL, to accept wagers from Michiganders, electronic betting platforms like TwinSpires must partner with a licensed racetrack (even though the bets need not be made at the track) and obtain a license of their own.

That year, TwinSpires sought the newly available third-party facilitator license. To obtain a license, a "third-party facilitator must have a joint contract with all race meeting licensees and certified horsemen's organizations in [Michigan]." Mich. Comp. Laws § 431.308(1)(d)(i). So TwinSpires partnered with Michigan's only racetrack, Northville Downs, and with the state's certified horsemen's associations. As part of this deal, TwinSpires agreed to give Northville a share of all wagers placed by Michiganders on its platform. The Board granted TwinSpires a third-party facilitator license in 2020 and later renewed it through 2024.

But in early January 2025, Northville temporarily lost its race meeting license. Because Northville was Michigan's only licensed racetrack, the Board instructed all third-party facilitators to stop accepting wagers from Michiganders. TwinSpires refused. So the Board suspended TwinSpires' license.

At the end of January, Northville recovered its race-meeting license. Licensed third-party facilitators could once again accept pari-mutuel wagers from Michiganders, provided they contracted with Northville. But the Board maintained its suspension of TwinSpires' license. Without a license, TwinSpires couldn't comply with the MHRL (even though the Board opened the door for other third-party facilitators).

So TwinSpires sued. It alleged that the IHA preempts Michigan's licensing requirement. And it moved to enjoin the Board's enforcement of its licensing requirements. The court issued a preliminary injunction. The injunction prevents Michigan from enforcing the MHRL's licensing requirement against TwinSpires.

Michigan appealed. It sought to stay the preliminary injunction pending appeal. The district court denied the stay motion. Michigan then moved for a stay in our Court. We denied the motion. We reasoned that TwinSpires was likely to succeed on its conflict-preemption argument, and that the other preliminary injunction factors favored TwinSpires.

## III.

A preliminary injunction "is an extraordinary equitable remedy" that serves "to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (citation modified). A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Showing a likelihood of success on the merits isn't enough. A plaintiff "must also show that some irreparable harm will take place without the court's immediate intervention." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 883 (6th Cir. 2025). We review a "district court's ultimate decision whether to grant a preliminary injunction for abuse of discretion." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 607 (6th Cir. 2024) (citation modified). Under this "highly deferential" standard, we "review the district court's legal conclusions *de novo* and its factual findings for clear error." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (citation modified).

## IV.

We first consider whether TwinSpires is likely to succeed on the merits of its preemption arguments. We conclude that TwinSpires is likely to succeed on a conflict-preemption theory.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). So state and federal laws "can be in conflict or at cross-purposes," and when that happens, the Supremacy Clause "provides a clear rule" that federal law wins out. *Id.* at 399. Congress thus "has the power to preempt state law." *Id.*

Sometimes, Congress expressly withdraws specified powers from the states. *Id.* Express preemption provisions indicate Congress's preemptive intent through language rather than through a statute's structure and purpose. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

Preemption can also be implied. There are two kinds of implied preemption: field and conflict.

Field preemption is the principle that States may not regulate conduct "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. A federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376, 390 (2015) (Natural Gas Act occupies the field of "wholesale sales and transportation of natural gas in interstate commerce," but preserves state-law antitrust claims based on gas price manipulation (citation modified)). And, in the context of field preemption, the Supreme Court has noted "the importance of considering the *target* at which the state law *aims* in determining whether that law is pre-empted." *Id.* at 385.

Under the principle of conflict preemption, federal law preempts state law if the two "directly conflict." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation modified). That occurs when compliance with both is impossible, or when, as relevant here, state law "stand[s] as an obstacle to the accomplishment" of Congress's objectives. *Kansas v. Garcia*, 589 U.S. 191, 210–11 (2020) (citation modified); *Arizona*, 567 U.S. at 399.

The district court ruled for TwinSpires on field-preemption grounds. But because conflict-preemption principles suffice to resolve this case, we leave field preemption for another day. *See generally Horseman's Benevolent & Protective Ass'n-Ohio Div., Inc. v. DeWine*, 666 F.3d 997 (6th Cir. 2012).

TwinSpires is likely to succeed on a conflict-preemption theory for two reasons.

First, the MHRL interferes with the IHA's objectives. Congress intended to loop two states into the process—at least with respect to consents. *See* 15 U.S.C. § 3004 (off-track and host track states must consent). The MHRL tells regulated parties that the IHA's two-state

scheme isn't enough. So it interferes with the IHA's *methods* to reach the objectives of "prevent[ing] interference by one State with the gambling policies of another" and "ensur[ing] States . . . cooperate . . . in the acceptance of legal interstate wagers." *Id.* § 3001. By thwarting the IHA's methods for achieving its stated objectives, the MHRL poses an obstacle to the IHA. That's a conflict. *See Horseman's Benevolent*, 666 F.3d at 1000–01 ("The horsemen's veto is an integral part of the [IHA], and because the Ohio statute would negate the veto in certain circumstances, it is preempted."); *Verizon N., Inc. v. Strand*, 309 F.3d 935, 940 (6th Cir. 2002) ("state law is preempted if it interferes with the methods by which the federal statute was designed to reach its goal" (citation modified)).

This case mirrors our decision in *Horseman's Benevolent*, 666 F.3d 997. There, we concluded that an IHA provision that allows horsemen's groups to veto off-track wagering preempted an Ohio statute that forbade horsemen's groups from "unreasonably" withholding their consent. *Id.* at 1000–01. The IHA preempted Ohio's "alternative path." *Id.* at 1001. So too here. Just as Ohio sought to supplement the IHA by modifying the horsemen's veto, Michigan seeks to supplement the IHA by providing betting platforms with a "different process" to securing legal off-track wagering. *Id.* The Supremacy Clause precludes that result.

And second, Michigan targets the federal scheme by bolting on an additional consent for wager acceptances. The Supreme Court has disapproved of states tailoring regulation to target federal schemes, at least in the context of field preemption. *See Oneok*, 575 U.S. at 385 ("the *target* at which the state law *aims*" informs preemption). And courts have found conflict preemption when states tailor statutes to interfere with federal methods, even if states share federal aims. That's because those statutes don't just regulate primary conduct. They seem to regulate the federal government as well. *See, e.g.*, *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 541–43 (5th Cir. 2013) (Reavley, J., concurring) (finding conflict preemption when "the sole purpose and effect of [an] ordinance is to target the presence of illegal aliens," because that interferes with the federal government's "careful scheme"). Nor can states rely on generally applicable laws to impliedly target federal schemes. *See King v. Navy Fed. Credit Union*, 148 F.4th 628, 634 (9th Cir. 2025) (avoiding reading that "would create an

utterly irrational loophole where states could target federal credit unions simply by relying on [generally applicable] statutes" (citation modified)).

The MHRL provision here doesn't even regulate primary conduct. It's a tailor-made addition to the IHA. So Michigan can't save itself by likening its scheme to traditional state gambling regulations. If the MHRL regulated wager types and if Michigan had no intention of targeting the IHA scheme, there might not be a conflict because any effect on the IHA would lie downstream of Michigan's earnest effort to regulate its residents' primary conduct. *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 549–50 (2001) ("There is a critical distinction . . . between generally applicable zoning regulations . . . and regulations targeting cigarette advertising."); *cf., e.g.*, *Garcia*, 589 U.S. at 219 (Breyer, J., concurring in part and dissenting in part) (explaining result in *Arizona* by noting that "even generally applicable and facially neutral state laws may be [conflict] preempted" when they impliedly target federal prerogatives). Similarly, if Michigan banned interstate horserace wagering outright, the ban's generality might insulate it from accusations of targeting the federal scheme.[3] *See, e.g.*, *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001) (generally applicable zoning ordinances aren't "sufficiently linked to rules governing the operation of the railroad so as to constitute laws with respect to regulation of rail transportation" (citation modified)). But that's not what Michigan did. It intruded into the federal scheme by regulating how betting platforms accept wagers. Legitimate regulation of its residents' gambling conduct came second. *See* Mich. Comp. Laws § 431.317(9) ("A person that does not hold . . . a third-party facilitator license that solicits or accepts wagers on the results of live or simulcast horse races . . . is guilty of a felony."); *id.* § 431.317(10) ("Only a race meeting licensee or its *contracted licensed* third-party facilitator may . . . accept . . . wagers on the results of live or simulcast horse races." (emphasis added)).

---

[3]Admittedly, whether a state can allow wagering on horseraces at in-state tracks but ban interstate horserace wagering is a difficult question not presented by this case.

In addition, as we detail below, in this context, the greater power to ban interstate horserace wagering does not include the "lesser" power to impose licensing restrictions that conflict with the federal regime.

Michigan disagrees. It raises two main arguments against conflict preemption. We aren't persuaded.

First, Michigan interprets the IHA to allow it and other states where bets are placed to determine whether to permit interstate wagering. And it argues that its current licensing scheme falls within its power to determine legality vel non.

Michigan reads the statute consistent with states' prerogative to regulate gambling. It warns us that an overly broad reading of the IHA would impinge on its core police power to oversee gambling—and make gambling policy—within its borders. We agree that the IHA leaves states with the "primary responsibility for determining what *forms of gambling* may legally take place *within their borders*." 15 U.S.C. § 3001(a)(1) (emphasis added). And we note that Congress tends to "respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy v. NCAA*, 584 U.S. 453, 484 (2018).

Michigan then points to the IHA's definition of "interstate off-track wager." Under the IHA, an "interstate off-track wager" is "a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved . . . as well as the combination of any pari-mutuel wagering pools." 15 U.S.C. § 3002(3). Michigan notes that the IHA applies only to "legal" wagers. And it interprets "legal" to mean any wager that's legal according to Michigan law.

So the parties dispute whether "legal" means legal *under state law*. We agree with Michigan and conclude that it does. The definition of "interstate off-track wager" contemplates legality in three states. It covers the states where the wager is placed, where the wager is accepted, and where the horserace is held. The definition says as much. 15 U.S.C. § 3002(3) ("a legal wager *placed or accepted* in one State with respect to . . . a horserace . . . in another State" (emphasis added)). Congress envisioned the specific three-state scenario that we have here. It sought to regulate the "transmi[ssion]" and "plac[ing]" of interstate wagers, *id.*, even though smartphones and internet apps weren't available yet.

The upshot is that the state where the bet is placed can put some legality restriction on placing the bet. But whether this means it can ban gambling entirely, ban wagering on

horseracing, or ban interstate horseracing specifically is secondary in this case because Michigan hasn't done any of these. Instead, what Michigan has done is impose a specific restriction on the out-of-state entities that accept the bets.

Michigan defends its licensing restriction as a specific manifestation of its power to regulate wager legality. It construes the MHRL's requirements as defining a legal wager in Michigan. So on its view, the IHA's three consent requirements apply only *after* TwinSpires obtains a third-party facilitator license under the MHRL. That's because a wager isn't legal in Michigan—and 15 U.S.C. § 3004 isn't triggered—until TwinSpires obtains the license.

We disagree. Michigan can't condition the legality of interstate wagers on state requirements that add to the IHA's consent scheme. A license requirement for third-party facilitators doesn't regulate "forms of gambling." *Id.* § 3001(a)(1). It regulates how off-track betting platforms accept interstate wagers. So Michigan's requirement is more like a plug-and-play supplement to the federal scheme than an earnest effort to regulate its residents' conduct. *Compare* Mich. Comp. Laws § 431.317(10) (limiting acceptance of wagers to "contracted licensed third-party facilitator[s]"), *with* 15 U.S.C. § 3004 ("An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from" the host racing association, the host racing commission, and the off-track racing commission). It's unlike laws that govern wager types, for example, because those could be "forms of gambling." 15 U.S.C. § 3001(a)(1); *cf.* 7 Pa. Code § 193.6 (regulating a specific wager type). It's also unlike a wholesale ban on interstate horserace wagering, which might pass muster if that whole category is a "form[] of gambling." 15 U.S.C. § 3001(a)(1); *cf.* Tex. Occ. Code § 2027.052 (prohibiting wagering on out-of-state horse races). As we noted above, the IHA might permit Michigan to limit wager types or even ban horserace wagering altogether.[4] But those greater powers don't

---

[4]The district court read "legal" to refer to legality under the IHA. The stay panel read "legal" to demand "compliance with [other] federal laws regulating areas beyond the IHA's domain." D.40, Ord. Den. Mot. to Stay, at 6. And both agreed that "lawful in each state involved" refers to whether pari-mutuel horserace wagers are "general[ly]" legal in a state. *Id.* We have a different view. As we explain, we read "legal" to also at least contemplate state gambling regulations that govern primary conduct because the IHA leaves states with the task of regulating "forms of gambling." 15 U.S.C. § 3001(a)(1). And we read "lawful in each state involved" to refer to the legality of transmitting and accepting wagers. It has independent meaning, but it's less relevant here. So we interpret the definition of "interstate off-track wager" to provide states with more leeway to regulate gambling, even if some regulations incidentally affect interstate horserace wagering. But we agree with the stay panel and the

include this lesser one. Michigan can't craft its own consent requirement and call it a condition to legality. The IHA's plain text makes that clear.[5]

So putting aside any metaphysical question about when a licensing or other regulation effectively becomes a ban or whether they are indistinguishable, what Michigan has done here runs afoul of the IHA. In other words, no matter how one labels what Michigan has done, we know that it can't do it because it conflicts with the IHA. Indeed, given that Congress contemplated a three-state scenario, it's telling that the consent provision doesn't apply, by its terms, to the bettor's state. *See* 15 U.S.C. §§ 3002, 3004.

Second, Michigan raises two out-of-circuit cases that found no conflict between the IHA and state statutes. *See Monarch Content Mgmt., LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021 (9th Cir. 2020); *Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.*, 479 F.3d 1310 (11th Cir. 2007) (per curiam). But those cases are distinct.

In *Monarch*, an Arizona statute that required any simulcast of live racing "that originates from outside" the state to "be offered to each commercial live-racing permittee and additional wagering facility in the state" didn't conflict with the IHA. 971 F.3d at 1025 (citation modified). It provided one avenue for the off-track racing commission (Arizona's commission) to withhold its consent.[6] *Id.* at 1028–29. An off-track racing commission has an absolute veto right over interstate wagering. *See* 15 U.S.C. § 3004(a); *Monarch*, 971 F.3d at 1028–29. A state statute that required the commission to withhold consent absent a condition imposed only within the state didn't diminish that right.[7] 971 F.3d at 1029 ("Even if . . . the Arizona Racing

---

district court that, regardless of what states *can* do, they can't target and subvert the federal scheme, as Michigan did here.

[5]Since the IHA's plain text forecloses Michigan's interpretation, and since the regulation of *interstate* gambling isn't a traditional area of state regulation, the presumption against preemption doesn't apply. *See Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 151 (2001) (defining presumption as applying "in areas of traditional state regulation such as family law," and noting that presumption overcome where "Congress has made clear its desire for [preemption]").

[6]The court referred to Arizona's commission as the off-track commission, even though the wagers at issue were both placed and accepted in Arizona. 971 F.3d at 1026–27.

[7]It's not clear that the statute at issue in *Monarch* required the Arizona Racing Commission to withhold consent, *see* 971 F.3d at 1029, but we assume for purposes of our analysis that it did.

Commission will choose to withhold its consent . . . the IHA contains no clear and manifest purpose to limit the Commission's veto." (citation modified)); *id.* at 1027 (Arizona's statute has only intrastate reach). Nor did it affect any other consent rights under the IHA, such as the host racing association's veto. *See id.* at 1029.

So Arizona's statute didn't conflict with the IHA because a regulated party like TwinSpires faced the same federal regulatory scheme in Arizona as in every other state: three consents that may be withheld for any reason. Arizona just codified one reason. Here, by contrast, the MHRL waters down the three IHA-required consents by declaring "*these three are not enough*," and forces betting platforms to jump through one last state-imposed hoop. So it shrinks the rights of the three IHA-designated consenters and imposes extra burdens on betting platforms. The Arizona statute in *Monarch* did no such thing.

*Gulfstream* concerned Florida's Wagering Act, which limited pari-mutuel wagers on simulcasts from out-of-state host tracks to venues that had state permits. 479 F.3d at 1311–12. Preemption was an ancillary issue, but the court found no conflict with the IHA. *Id.* at 1312 n.3. And for good reason. The Wagering Act didn't bear on the three IHA-required consents. It regulated simulcasting at in-state venues. But the IHA has nothing to say about simulcasting or its intrastate regulation, so *Gulfstream* isn't relevant. *See Turfway*, 20 F.3d at 1412 ("[T]he [IHA] regulates interstate wagering, not simulcasting. In fact, the [IHA] does not even mention simulcasting.").

Thus, TwinSpires has demonstrated a substantial likelihood of success on the merits. In constitutional cases, success on the merits is "typically dispositive" because "when constitutional rights are threatened or impaired, irreparable injury is presumed," "no cognizable harm results from stopping" the conduct, and it's "always in the public interest to prevent" constitutional violations. *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (citation modified). Still, the company isn't automatically entitled to an injunction on the merits alone. *Winter*, 555 U.S. at 20 (movant seeking preliminary injunction "must establish" the four factors).

## V.

To obtain a preliminary injunction, TwinSpires must establish irreparable injury. *See EOG Res.*, 134 F.4th at 883 (while courts may balance the extent of an injury against the other factors, the existence of an irreparable injury is mandatory). Injury can't be "speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (citation omitted). And unreasonable delay undercuts irreparable injury. *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (unreasonable delay when plaintiff didn't file federal action until six years after defendant's initial state challenge).

TwinSpires has met its burden. Unlike lost profits, which can be "fairly easily . . . remedied through damages," courts can't easily compensate a movant for loss of competitive position and goodwill. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015). TwinSpires' irreparable injury reflects the latter two considerations. It warned that it might "lose access to its 18,000 Michigan users" if forced to shut down, and that Michigan's "accusations of illegal gambling activity have hurt its reputation and caused a loss of customer goodwill." R.19, P.I. Opinion, PageID 470–71. That suffices.

And TwinSpires didn't wait too long to seek an injunction. It sought one as soon as the Executive Director suspended its license. R.19, P.I. Opinion, PageID 472. That's in the Goldilocks zone—neither too early nor too late. *See Tri-Cnty. Wholesale Distribs., Inc. v. Wine Grp., Inc.*, 565 F. App'x 477, 482–83 (6th Cir. 2012) (immediate and certain irreparable injury upon notice of franchise termination); *cf. D.T.*, 942 F.3d at 327 (too many "if" contingencies precede future injury when parents must disenroll child *and* choose not to enroll him in another school before state could prosecute them for truancy); *Huron*, 545 F. App'x at 397 (seeking federal injunction six years after state suit is unreasonable delay). Had TwinSpires sought an injunction before that suspension, it would have been premature. The Executive Director's not-yet-announced suspension would have posed another "if." *See D.T.*, 924 F.3d at 327 (hypothetical threat of prosecution is not immediate, irreparable injury). So TwinSpires can't be faulted for its pre-suspension compliance with Michigan's licensing regime.

**VI.**

Finally, TwinSpires must refute Michigan's claimed harms and show that the public interest lies with an injunction. *See Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023). The last two factors merge here because a state government is the defendant, so TwinSpires can prove these factors together. *Id.* at 557.

TwinSpires has done so here. The "merged" other harm and public interest factors favor TwinSpires because enjoining the enforcement of a law that violates constitutional rights "is always in the public interest." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 736 (6th Cir. 2021) (per curiam) (citation modified).

In opposing the injunction, Michigan raises a series of arguments sounding in the other harm and public interest factors. Its arguments aren't persuasive.

Michigan points to its interest in regulating gambling and its residents' interest in the protections of Michigan law. But Michigan didn't lose its ability to regulate gambling other than wagering on interstate horseracing. The IHA is clear on that. 15 U.S.C. § 3001(a)(3) ("in the *limited area* of interstate off-track wagering on horseraces, there is a need for Federal action" (emphasis added)). Nor does the IHA necessarily prohibit Michigan from promulgating gambling regulations that incidentally bear on interstate horserace wagering (such as limiting wager types). And, of course, the state retains authority to regulate horseraces run in Michigan and horserace wagers accepted in Michigan because it wields IHA consent rights in those situations.

Michigan also highlights the loss of revenue from Northville Downs. But any loss of revenue is self-inflicted because the *Board* ordered TwinSpires to shut down. *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 125 (6th Cir. 2019) (harm to plaintiff "outweighed" defendants' "self-inflicted harm").

And it notes a harm to competition: other third-party facilitators, but not TwinSpires, halted online pari-mutuel wagering when Northville temporarily lost its license. But this gets it backwards. The Board ended Northville's suspension in January 2025, and other facilitators are

now free to accept wagers in compliance with the MHRL.  TwinSpires still faces a license suspension.  So TwinSpires would still face a competitive harm but for the injunction.  And Michigan's claimed harm to competition—which arose from the brief period when TwinSpires refused to comply with the Board—has dissipated.  *See Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 946 (9th Cir. 2013) (balance of equities favors movant, who has shown that it "will continue to be the victim[] of . . . harassment," whereas non-movant "points to no hardship that it *will suffer*" (emphasis added)).

We side with TwinSpires on the merged other harm and public interest factors.

**VII.**

For these reasons, we affirm.